THE UNITED STATES DISTRICT COURTS
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAZZIYON SNYDER<br>215 Derrer Road<br>Columbus, Ohio 43204 | )<br>)<br>)<br>) | CASE NO.<br><br>JUDGE: |
| Plaintiff, | )<br>) | |
| v. | )<br>) | **COMPLAINT FOR DAMAGES**<br>**AND REINSTATEMENT** |
| AAAG-OHIO, LLC<br>d/b/a Columbus Fair Auto Auction<br>4700 Groveport Road<br>Obetz, Ohio 43207 | )<br>)<br>)<br>)<br>) | **JURY DEMAND ENDORSED**<br>**HEREIN** |
| **Serve also:**<br>AAAG-OHIO, LLC<br>10333 N. Meridian Street, Suite 200<br>Indianapolis, Indiana 46290 | )<br>)<br>)<br>)<br>) | |
| -and- | )<br>) | |
| ANYTIME LABOR LLC<br>d/b/a LaborMax<br>4008 Alum Creek Drive<br>Columbus, Ohio 43207 | )<br>)<br>)<br>)<br>) | |
| **Serve also:**<br>ANYTIME LABOR LLC<br>c/o National Registered Agents, Inc.<br>4400 Easton Commons Way, Suite 125<br>Columbus, Ohio 43219 | )<br>)<br>)<br>)<br>)<br>) | |
| Defendants. | ) | |

Plaintiff, Jazziyon Snyder, by and through undersigned counsel, as her Complaint against the Defendants, states and avers the following:

## PARTIES

1. Snyder is a resident of the City of Columbus, County of Franklin, State of Ohio.

2. AAAG-Ohio, LLC d/b/a/ Columbus Fair Auto Auction (hereinafter "CFAA") is a domestic corporation that operated a business located at 4700 Groveport Road, Obetz, Ohio 43207.

3. Anytime Labor LLC d/b/a LaborMax (hereinafter "LaborMax") is a foreign corporation that operated a business located at 4008 Alum Creek Drive, Columbus, Ohio 43207.

## JURISDICTION & VENUE

4. All material events alleged in this Complaint occurred in County of Franklin.

5. This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 in that Snyder is alleging a Federal Law Claim under the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 and under the Americans with Disabilities Act ("ADA") 42 U.S.C. 126 § 12101 *et seq*.

6. This Court has supplemental jurisdiction over Snyder's state law claims pursuant to 28 U.S.C. § 1367 as Snyder's state law claims are so closely related to her federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

8. Within 300 days of the conduct alleged below, Snyder filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2021-01272 against CFAA.

9. On or about March 24, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Snyder regarding the Charges of Discrimination brought by Snyder against CFAA in EEOC Agency Charge No. 532-2021-01272.

10. Within 300 days of the conduct alleged below, Snyder filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), Charge No. 532-2021-01274 against LaborMax.

11. On or about March 23, 2021, the EEOC issued and mailed a Notice of Right to Sue letter to Snyder regarding the Charges of Discrimination brought by Snyder against LaborMax in EEOC Agency Charge No. 532-2021-01274.

12. Snyder received her Right to Sue letters from the EEOC in accordance with 42 U.S.C. § 2000e-5(f)(1) - which have been attached hereto as Plaintiff's Exhibits A and B, respectively.

13. Snyder has filed this Complaint within 90 days of the issuances of the Notice of Right to Sue letters.

14. Snyder has properly exhausted her administrative remedies pursuant to 29 C.F.R. § 1614.407(b).

## FACTS

15. Snyder is a former employee of CFAA.

16. Snyder is a former employee of LaborMax.

17. CFAA and LaborMax are hereinafter referred to as Defendants.

18. Labor Max is a staffing agency.

19. In or around February 2020, Labor Max placed Snyder to work as an employee at CFAA.

20. Defendants were co-employers of Snyder.

21. Defendants contracted for Snyder to be placed at and perform work at CFAA's Columbus location.

22. CFAA had the power to terminate its contract with LaborMax concerning Snyder's assignment at CFAA.

23. CFAA had the power to set Snyder's rate of pay.

24. In the event that CFAA terminated the contract for Snyder's assignment, at CFAA, Snyder would not be compensated until the next assignment that LaborMax would be able to find for Snyder.

25. CFAA controlled all material aspects of Snyder's employment, such as hours worked and duties performed.

26. Snyder began working for CFAA in or around February 2020.

27. CFAA employed Snyder as a driver.

28. Snyder is African American.

29. Snyder suffers from attention-deficit/hyperactivity disorder ("ADHD") and bipolar disorder, which constitute a disability (hereinafter "Disability").

30. As a result of her Disability, Snyder is and was considered disabled within the meaning of the ADA 42 U.S.C. 126 § 12101 *et seq*.

31. As a result of her Disability, Snyder is and was considered disabled within the meaning of R.C. § 4112.01 *et seq*.

32. Upon hire, Mike Chido was Snyder's immediate supervisor.

33. During all material events asserted herein, Chido has and/or had authority to hire, fire, and/or discipline employees.

34. Chido did not participate in the decision to hire Snyder.

35. Chido is Caucasian.

36. Chido perceived Snyder's Disability to impair one or more of her major life activities, including working.

37. Snyder's Disability substantially impaired one or more of her major life activities, including working.

38. Despite this actual or perceived disabling condition, Snyder was still able to perform the essential functions of her job.

39. Chido immediately began treating Snyder differently than her coworkers (hereinafter "Chido's Treatment").

40. Snyder's coworkers noticed Chido was treating Snyder differently.

41. Chido's Treatment included avoiding talking to Snyder, and only responding to her questions with curt responses or nods and shakes of his head.

42. Chido was regularly friendly and talkative with Snyder's Caucasian coworkers.

43. Chido was regularly friendly and talkative with Snyder's non-disabled coworkers.

44. Chido did not avoid talking to Snyder's Caucasian coworkers or only respond to their questions with curt responses or nods and shakes of his head.

45. Chido did not avoid talking to Snyder's non-disabled coworkers or only respond to their questions with curt responses or nods and shakes of his head.

46. Chido's Treatment included disciplining Snyder if she was one minute late.

47. Chido did not discipline Snyder's Caucasian coworkers if they were one minute late.

48. Chido did not discipline Snyder's non-disabled coworkers if they were even one minute late.

49. Chido regularly allowed Snyder's Caucasian coworkers to arrive to work fifteen or more minutes late.

50. Chido regularly allowed Snyder's non-disabled coworkers to arrive to work fifteen or more minutes late.

51. Chido's Treatment included requiring Snyder to work alone on Lane 1.

52. Snyder submitted multiple requests to Chido to work on another lane.

53. On or about June 10, 2020, Snyder requested to work on another lane.

54. Chido's Treatment included ignoring Snyder's requests to work on a different lane.

55. Chido regularly allowed Snyder's Caucasian coworkers to work in pairs.

56. Chido regularly allowed Snyder's non-disabled coworkers to work in pairs.

57. Chido regularly allowed Snyder's Caucasian coworkers to request and work on their preferred lanes.

58. Chido regularly allowed Snyder's non-disabled coworkers to request and work on their preferred lanes.

59. On or about June 10, 2020 Snyder received a call from Pia Last Name Unknown ("Pia LNU") (hereinafter "Pia's Call").

60. Pia LNU worked for LaborMax as a manager.

61. Pia LNU did not participate in the decision to hire Snyder.

62. Pia LNU is African American.

63. During Pia's Call, Pia LNU reprimanded Snyder for having an "attitude" and for being "demanding."

64. During Pia's Call, and in response to Pia LNU's reprimand, Snyder informed Pia LNU everyone else was permitted to place requests for their preferred lane.

65. During Pia's Call, Snyder complained she was being discriminated against.

66. During Pia's Call, Snyder complained Pia LNU was singling her out for a reprimand due to her Disability (hereinafter "Discrimination Complaint").

67. After Pia's Call, Pia LNU took no action to remedy the discrimination.

68. Upon information and belief, CFAA has a policy requiring investigations following receipt of a complaint of discrimination.

69. Upon information and belief, LaborMax has a policy requiring investigations following receipt of a complaint of discrimination.

70. An investigation should include interviewing the complainant.

71. An investigation should include interviewing the subject of the complaint.

72. An investigation should include interviewing the subject of the reported incident.

73. An investigation should include interviewing witnesses to the reported incident.

74. An investigation should include getting a written statement from the complainant.

75. An investigation should include getting a written statement from the subject of the complaint.

76. An investigation should include getting a written statement from the subject of the reported incident.

77. In response to Snyder's Discrimination Complaint, CFAA did not interview Chido.

78. In response to Snyder's Discrimination Complaint, LaborMax did not interview Pia LNU.

79. In response to Snyder's Discrimination Complaint, CFAA did not get a written statement from Snyder.

80. In response to Snyder's Discrimination Complaint, LaborMax did not get a written statement from Snyder.

81. In response to Snyder's Discrimination Complaint, CFAA did not get a written statement from Chido.

82. In response to Snyder's Discrimination Complaint, LaborMax did not get a written statement from Pia LNU.

83. In response to Snyder's Discrimination Complaint, CFAA did not take corrective action against Chido.

84. In response to Snyder's Discrimination Complaint, LaborMax did not take corrective action against Pia LNU.

85. CFAA ratified Chido's discriminatory conduct in failing to conduct an investigation into Snyder's Discrimination Complaint.

86. LaborMax ratified Pia LNU's discriminatory conduct in failing to conduct an investigation into Snyder's Discrimination Complaint.

87. CFAA ratified Chido's discriminatory conduct in failing to discipline Chido following Snyder's Discrimination Complaint.

88. LaborMax ratified Pia LNU's discriminatory conduct in failing to discipline Pia LNU following Snyder's Discrimination Complaint.

89. On or about June 24, 2020, Snyder began feeling sick while at work, and asked Rita Last Name Unknown ("Rita LNU"), her supervisor, if she could go home early.

90. Rita LNU worked for CFAA as a supervisor.

91. Rita LNU did not participate in the decision to hire Snyder.

92. Rita LNU is Caucasian.

93. On June 24, in response to Snyder's request to go home early, Rita LNU told Snyder she could leave as long as she notified Pia LNU by text message.

94. On June 24, 2020 before she left work, Snyder texted Pia LNU to notify her she was going home sick.

95. After Pia LNU received Snyder's June 24 text message, Pia LNU called Snyder and notified her CFAA was terminating her employment for leaving work early.

96. To the extent Snyder had left work early, she left with her manager's permission on the condition she text Pia LNU to notify her.

97. Caucasian employees were regularly allowed to leave work early if they were feeling sick, and their employment was not terminated as a result.

98. Non-disabled employees were regularly allowed to leave work early if they were feeling sick, and their employment was not terminated as a result.

99. Defendants' purported reason for termination is pretext for disability discrimination.

100. Defendants' purported reason for termination is pretext for race discrimination.

101. Defendants' purported reason for termination is pretext for retaliation.

102. Upon information and belief, Defendants have a progressive disciplinary policy ("Progressive Discipline Policy").

103. Defendants have used the Progressive Discipline Policy when disciplining Caucasian employees.

104. Defendants have used the Progressive Discipline Policy when disciplining non-disabled employees.

105. Defendants have used Progressive Discipline Policy when disciplining employees who have not complained of discrimination.

106. Under Progressive Discipline Policy, Snyder had not received any meaningful discipline.

107. Under Progressive Discipline Policy, Snyder had not received any written warnings.

108. Under Progressive Discipline Policy, Snyder had not been suspended.

109. Defendants skipped steps under the Progressive Discipline Policy when they terminated Snyder's employment.

110. Skipping steps under the Progressive Discipline Policy is an adverse employment action.

111. Skipping steps under the Progressive Discipline Policy is an adverse action.

112. Terminating Snyder's employment was an adverse employment action.

113. Terminating Snyder's employment was an adverse action.

114. Defendants knowingly skipped steps under the Progressive Discipline Policy when they terminated Snyder's employment.

115. Defendants intentionally skipped steps under the Progressive Discipline Policy when they terminated Snyder's employment.

116. Defendants willfully skipped steps under the Progressive Discipline Policy when they terminated Snyder's employment.

117. Defendants knowingly committed an adverse employment action against Snyder.

118. Defendants intentionally committed an adverse employment action against Snyder.

119. Defendants willfully committed an adverse employment action against Snyder.

120. Defendants knowingly committed an adverse action against Snyder.

121. Defendants intentionally committed an adverse action against Snyder.

122. Defendants willfully committed an adverse action against Snyder.

123. Defendants knowingly terminated Snyder employment.

124. Defendants intentionally terminated Snyder's employment.

125. Defendants willfully terminated Snyder's employment.

126. The above facts demonstrate Defendants engaged in a pattern and practice of race discrimination.

127. The above facts demonstrate Defendants engaged in a pattern and practice of disability discrimination.

128. The above facts demonstrate Defendants engaged in a pattern and practice of retaliation.

129. There was a causal connection between Snyder's race and Defendants' termination of Snyder's employment.

130. There was a causal connection between Snyder's Disability and Defendants' termination of Snyder's employment.

131. There was a causal connection between Snyder's Discrimination Complaint and Defendants' termination of Snyder's employment.

### **COUNT I: DISABILITY DISCRIMINATION IN VIOLATION OF ADA**

132. Snyder restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

133. Defendants treated Snyder differently than other similarly-situated employees based on her disabling condition.

134. Defendants treated Snyder differently than other similarly-situated employees based on her perceived disabling condition.

135. On or about June 24, 2020, Defendants terminated Snyder's employment without just cause.

136. Defendants terminated Snyder's employment based on her disability.

137. Defendants terminated Snyder's employment based on her perceived disability.

138. Defendants violated ADA when it discharged Snyder based on her disability.

139. Defendants violated ADA when it discharged Snyder based on her perceived disability.

140. Defendants violated ADA by discriminating against Snyder based on her disabling condition.

141. Defendants violated ADA by discriminating against Snyder based on her perceived disabling condition.

142. Snyder informed Defendants of her disabling condition.

143. Snyder requested accommodations from Defendants to assist with her disabilities.

144. Snyder requested accommodations from Defendants to assist with her disabilities, including taking leave.

11

145. Snyder's requested accommodations were reasonable.

146. There was an accommodation available that would have been effective and would have not posed an undue hardship to Defendants.

147. Defendants failed to engage in the interactive process of determining whether Snyder needed an accommodation.

148. Defendants failed to provide an accommodation.

149. Defendants violated ADA by failing to provide Snyder a reasonable accommodation.

150. As a direct and proximate result of Defendants's conduct, Snyder suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT II: DISABILITY DISCRIMINATION

151. Snyder restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

152. Snyder suffers from ADHD and bipolar disorder.

153. Snyder is disabled.

154. In the alternative, Defendants perceived Snyder as being disabled.

155. Snyder's condition constituted a mental impairment.

156. Snyder's condition substantially impaired one or more of her major life activities including working.

157. Defendants perceived Snyder's condition to impair one or more of her major life activities including working.

158. Defendants treated Snyder differently than other similarly-situated employees based on her disabling condition.

159. Defendants treated Snyder differently than other similarly-situated employees based on her perceived disabling condition.

160. On or about June 24, 2020, Defendants terminated Snyder's employment without just cause.

161. Defendants terminated Snyder's employment based her disability.

162. Defendants terminated Snyder's employment based her perceived disability.

163. Defendants violated R.C. §4112.02 when it discharged Snyder based on her disability.

164. Defendants violated R.C. §4112.02 when it discharged Snyder based on her perceived disability.

165. Chido violated R.C. §4112.02 by discriminating against Snyder based on her disabling condition.

166. Defendants violated R.C. §4112.02 by discriminating against Snyder based on her perceived disabling condition.

167. Snyder suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

168. As a direct and proximate result of Defendant's conduct, Snyder suffered and will continue to suffer damages, including economic and emotional distress damages.

### COUNT III: RETALIATION IN VIOLATION OF ADA

169. Snyder restates each and every prior paragraph of this complaint, as if it were fully restated herein.

170. Snyder opposed Defendants failure to accommodate her disability.

171. After Snyder opposed Defendants denial of the Request for Accommodation.

172. Defendants actions were retaliatory in nature based on Snyder's opposition to the unlawful discriminatory conduct.

173. Pursuant to ADA, it is an unlawful discriminatory practice to retaliate against an employee for opposing unlawful discrimination.

174. As a direct and proximate result of Defendants conduct, Snyder suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT III: RACE DISCRIMINATION IN VIOLATION OF R.C. § 4112.02

175. Snyder restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

176. Throughout her employment, Snyder was fully competent to perform her essential job duties.

177. Defendants treated Snyder differently than other similarly situated employees based on her race.

178. Defendants violated Ohio Revised Code § 4112.01 *et seq.* by discriminating against Snyder due to her race.

179. On or about June 24, 2020, CFAA terminated Snyder without just cause.

180. At all times material herein, similarly situated non-African-American employees were not terminated without just cause.

181. Defendants terminated Snyder based on her race.

182. Defendants violated O.R.C. § 4112.01 et. seq. when they terminated Snyder based on her race.

183. Snyder suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

184. As a direct and proximate result of Defendants' conduct, Snyder has suffered and will continue to suffer damages, including economic and emotional distress damages.

### COUNT IV: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. 2000e-2.

185. Snyder restates each and every prior paragraph of this complaint as if it were fully restated herein.

186. Throughout her employment, Snyder was fully competent to perform her essential job duties.

187. Defendants treated Snyder differently than other similarly situated employees based on her race.

188. Defendants violated 42 U.S.C. 2000e-2 *et seq.* by discrimination against Snyder due to her race.

189. On or about June 24, 2020, CFAA terminated Snyder without just cause.

190. At all times material herein, similarly situated non-African-American employees were not terminated without just cause.

191. Defendants terminated Snyder based on her race.

192. Defendants violated 42 U.S.C. 2000e-2 *et seq.* when they terminated Snyder based on her race.

193. As a direct and proximate result of Defendants' conduct, Snyder has suffered and will continue to suffer damages, including economic and emotional distress damages.

### **COUNT V: RETALIATION IN VIOLATION OF 42 U.S.C. §2000E-3(a)**

194. Snyder restates each and every prior paragraph of this complaint, as if it were fully restated herein.

195. As a result of the discriminatory treatment described above, Snyder complained about the discrimination she was experiencing.

196. After engaging in protected complaints, Snyder suffered adverse actions.

197. After engaging in protected complaints, Snyder's employment was terminated.

198. Defendants' actions were retaliatory in nature based on Snyder's opposition to the unlawful discriminatory conduct.

199. Snyder suffered emotional distress damages as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to Title VII, 42 U.S.C. § 2000e-3 *et seq*.

15

200. As a direct and proximate result of Boeing's retaliatory discrimination against and termination of Snyder's employment, Snyder suffered and will continue to suffer damages.

## COUNT VI:  RETALIATION IN VIOLATION OF R.C. § 4112.02(I)

201. Snyder restates each and every prior paragraph of this complaint, as if it were fully restated herein.

202. As a result of the Defendant's discriminatory conduct described above, Snyder complained about the disability discrimination she was experiencing.

203. Subsequent to Snyder's Discrimination Complaint, her employment was terminated.

204. Defendant's actions were retaliatory in nature based on Snyder's opposition to the unlawful discriminatory conduct.

205. Pursuant to R.C. §4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

206. Snyder suffered emotional distress as a result of Defendants' conduct, and is entitled emotional distress damages pursuant to R.C. § 4112.01 *et seq*.

207. As a direct and proximate result of Defendant's retaliatory discrimination against and termination of Snyder, she suffered and will continue to suffer damages, including economic and emotional distress damages.

## DEMAND FOR RELIEF

WHEREFORE, Snyder demands from Defendants the following:

(a) Issue an order requiring Defendants to restore Snyder to one of the positions to which she was entitled by virtue of her application and qualifications, and expunge her personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Snyder for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Snyder's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

*/s/ Trisha M. Breedlove*
Trisha M. Breedlove (0095852)
**THE SPITZ LAW FIRM, LLC**
1103 Schrock Road, Suite 307
Columbus, Ohio 43229
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com

*Attorney for Plaintiff Jazziyon Snyder*

## JURY DEMAND

Plaintiff Jazziyon Snyder demands a trial by jury by the maximum number of jurors permitted.

*/s/ Trisha M. Breedlove*
Trisha M. Breedlove (0095852)
**THE SPITZ LAW FIRM, LLC**